## SULLIVAN v. EVANS-MORRIS-WHITNEY CO.

No. 3295.   Decided April 7, 1919.   (180 Pac. 435.)

1.  APPEAL AND ERROR—REVIEW—FINDINGS OF FACT—ACTION AT LAW —EVIDENCE CONSIDERED.  On defendant's appeal in an action at law tried to the court, the Supreme Court in reviewing the evidence determines only whether there is substantial evidence to sustain the findings, and need not consider the evidence of defendant.   (Page 299.)

2.  CORPORATIONS—MANAGER—TORTS—ACTS IN REPRESENTATIVE CAPACITY—EVIDENCE.  In an action for the value of mining stock purchased through defendant's manager and converted by him, evidence *held* to support a finding that the certificate for the stock was left with the manager as the representative of defendant, not in his individual capacity.   (Page 300.)

3.  CORPORATIONS—AUTHORITY OF AGENT—"MANAGER."  One advertised by mining stock brokers as the manager of their local branch has implied authority to retain for payment of assessments and resale any certificate of stock purchased through him, since "manager" implies one to whom the affairs of the principal have been committed, and one dealing with him may assume that his acts were authorized (citing Words and Phrases, First and Second Series, Manager).   (Page 300.)

Appeal from the District Court of Salt Lake County, Third District; *Hon. Harold M. Stephens*, Judge.

Action by T. J. Sullivan against the Evans-Morris-Whitney Company.

Judgment for plaintiff. Defendant appeals.

AFFIRMED.

*Morris & Callister* of Salt Lake City, for appellant.

*Dey, Hoppaugh & Fabian* of Salt Lake City, for respondent.

### APPELLANT'S POINTS.

It is well settled that one dealing with an agent is bound, at his peril, to ascertain the extent of the agent's authority and is chargeable with knowledge thereof. *Baker* v. *Seaward,* 127 Pac. (Or.), 961, 962

Third persons who are misled as to the agency, through their own fault or carelessness, cannot invoke the aid of estoppel. *Centennial Eureka Mining Co.* v. *Juab Co.,* 62 Pac. 1024, 1027; 22 Utah, 395.

### RESPONDENT'S POINTS.

Appellant being a corporation it could only act through its agents. George H. Taylor was one of its trusted agents, placed by appellant in sole and exclusive charge of the branch office at Eureka, Utah, "for the accommodation of Tintic customers." *Lester* v. *Snyder,* 55 Pac. 613.

### THURMAN, J.

The defendant is a mining stock broker principally engaged in the business of buying and selling mining stocks and mining securities. Its principal place of business is in Salt Lake City, but during the period complained of by plaintiff it had

a branch office' or place of business in Eureka, Utah, in charge of a local manager.

Plaintiff brought this action to recover the alleged selling price of 1,000 shares of mining stock which he alleges he directed the defendant to sell. He also alleges that defendant notified him that the sale was made as directed, but neglected and refused to pay him for the stock or for any part thereof. Plaintiff also alleges that the stock had been left in possession of defendant for a considerable length of time, subject to his order and direction, prior to his giving the order to sell the stock.

The only material issue raised by defendant's answer is that the transaction complained of was had with its agent or manager of the Eureka branch office, one Geo. H. Taylor, and that Taylor had no authority to receive and hold certificates of stock as alleged in plaintiff's complaint; that, if he did receive them for that purpose, he received them, not as defendant's representative, but in his own individual capacity. The plaintiff, in reply, relies on certain matter in estoppel, the particulars of which will appear in our review of the evidence.

The trial court, sitting without a jury, found for the plaintiff, and judgment was duly entered. Defendant appeals.

In the last analysis, the only question to be determined is: Was Geo. H. Taylor, who was admitted to be the defendant's manager at the Eureka branch office, acting within the scope of his authority, or apparent authority, as agent for defendant in the transaction of which plaintiff complains in the present case?

This requires at our hands an examination of the evidence relied on by plaintiff to support the judgment. The following facts are either admitted by defendant or conclusively established by the evidence:

(1) That defendant opened up a branch office in the town of Eureka for the purpose of facilitating its own business and accommodating its customers in the Tintic mining district.

(2) That it installed the said Geo. H. Taylor as its manager at said place and held him out as such.

(3)   That no limitation upon his authority as manager at said place was known to plaintiff at the time of the transaction which constitutes the subject-matter of plaintiff's complaint.

(4)   That defendant caused to be posted upon the building occupied as its branch office, and above the front door thereof, the following sign, which extended practically the entire length of the building:

Branch Office<br>
Evans-Morris-Whitney Co.<br>
Mining Brokers.<br>
George H. Taylor, Manager.

Phone 57.

(5)   That defendant caused to be published in the Eureka Reporter, a weekly paper published in Eureka, the following advertisement:

Evans-Morris-Whitney Co.<br>
Mining Securities.

Brokers.

26 Exchange Bldg., Salt Lake.

A branch office for the accommodation of Tintic customers has been opened at Eureka under the management of George H. Taylor. Phone us for quotations.   Office No. 57—Residence 259.

(6)   That defendant caused to be printed and distributed at various public places in Eureka a card the upper portion of which contained a detailed statement of commission charges for the buying and selling of stock while the lower part contained the following:

Evans-Morris-Whitney Co.<br>
Brokers.<br>
Salt Lake          Eureka

Eureka office under the management of George H. Taylor.   Telephone Nos.;   Office 57, Residence 259.

This sign, advertisement, and card, together with the fact that Taylor occupied the office as defendant's local manager and assumed to act for defendant in the matter of receiving orders from customers relating to stock transactions and assumed to communicate with defendant company at its Salt Lake office in relation thereto, constitute the indicia of Tay-

lor's authority as manager of defendant's business at that place.

As to the actual transaction out of which this controversy arose, the evidence on behalf of plaintiff shows that in April, 1916, while Taylor was acting as defendant's manager at Eureka, 'Mrs. T. D. Sullivan, a resident of that place and mother of plaintiff, placed an order with defendant, through Taylor as manager of the branch office, to purchase for her 1,000 shares of the capital stock of the Columbus Extension Mining Company, a mining corporation; that Taylor immediately placed the order with defendant at its Salt Lake office, and the order was duly executed, the stock purchased and statement thereof made by defendant through Taylor to Mrs. Sullivan; that she paid for the stock the price thereof including commission the sum of $120; that she did not receive the stock, and, when asked why she did not, she replied:

"Well, I am in the habit of leaving my stock with the brokers when I buy it."

She said that was her custom with the different brokers with whom she had done business. She also stated she had done so with defendant company on different occasions, specifying particular instances, naming the stock so purchased, the dates of the purchases, and when the stock was received. Her testimony showed that, in one instance after purchasing the stock from defendant, she left it in defendant's office for about a year, in another instance for about a year and three months. Her explanation as to why she did this was that in case of assessment the company would look after it and give her notice, also in case she wanted to sell the stock it would be with them to sell. On cross-examination defendant's counsel, evidently for the purpose of showing that the stock was retained by the broker as security, sought to show that witness had purchased some stock on margins, but this the witness positively disclaimed, reiterating that she left the stock purchased in the hands of the broker. In relation to the particular stock in question, she stated that when she gave her check to Taylor, made payable to defendant, she asked Taylor to have Evans-Morris-Whitney Company hold the stock until further notice.

Within a few days after this transaction, Mrs. Sullivan sold the stock to plaintiff and requested Taylor to have Evans-Morris-Whitney Company transfer it to plaintiff. Taylor promised to do so. This was early in May, 1916. Plaintiff, testifying in his own behalf in relation to the stock purchased from his mother said, in substance, that he asked Taylor concerning the transfer of the stock to him, and Taylor said it had been done. The witness also testified he did not receive the stock or see it, but he understood it was in Evans-Morris-Whitney Company's hands. He also testified he told Taylor he would leave the stock with Evans-Morris-Whitney Company, as some day he might want to sell it. It also appears from the evidence that, some time in July, Columbus Extension stock, by consolidation or otherwise, was converted into Columbus Rexall Mining Company stock for an equal number of shares. Plaintiff was informed by Taylor that his Columbus Extension stock had been converted into Columbus Rexall stock. Plaintiff never called for this stock, but left it the same as he had left the other. In July, 1916, plaintiff was notified by Taylor of an assessment on the stock in the sum of $20, which plaintiff paid in money. In November following, plaintiff was notified of another assessment on the stock in the same amount, which sum he also paid. Plaintiff paid another assessment, on notice from Taylor, for the same amount in April, 1917. The payments were all made to Taylor and receipts taken at the time of payment. On August 15, 1917, plaintiff directed Taylor to have the stock sold. Two or three days later, plaintiff received a typewritten statement purporting to come from defendant at Salt Lake City showing a sale of the stock on August 16th, for amounts aggregating the sum of $1,638.45. About the same time, Taylor and plaintiff met in Salt Lake City, and Taylor explained to plaintiff that he had had Evans-Morris-Whitney Company send plaintiff's check addressed to him at Bingham. Plaintiff said that would be all right, as his mail would be forwarded to Eureka. Plaintiff returned to Eureka, and after waiting for the check for several days, finally called up A. W. Young, who, in the meantime, had succeeded Taylor as defendant's agent at Eu-

reka, and requested Young to have Evans-Morris-Whitney Company stop payment on the check; plaintiff assuming it had become lost or miscarried through the mail. Young promised to call up defendant as requested. Several days later, plaintiff again made effort through Young to obtain the check, but failed. At last he received a phone message from Taylor making an appointment to meet him that night at 7 o'clock in Eureka, and he would bring the check. Plaintiff was promptly at the place designated for the meeting, but Taylor did not appear. Plaintiff, however, met Taylor later in the evening, and Taylor stated that the check was lost, but that he would give plaintiff his own personal check and fix the matter up with Evans-Morris-Whitney Company. Taylor gave plaintiff his check, which proved to be valueless. Plaintiff afterwards sought payment directly from the defendant company; but it, in effect, repudiated the entire transaction and refused payment.

It is not necessary to state in detail the evidence on behalf of defendant; this being an action at law, the only purpose we can have in reviewing the evidence at all is to determine whether or not there is substantial evidence to sustain the findings of the court.

In respect to the question as to whether or not the plaintiff and his mother left the stock in question with Geo. H. Taylor in his individual capacity or whether the left it with defendant Evans-Morris-Whitney Company, the court made the following finding:

"That neither the said Mrs. T. D. Sullivan nor the plaintiff herein left the certificates representing said 1,000 shares of stock in the Columbus Extension Mining Company, or the certificates representing said 1,000 shares of stock in the Columbus-Rexall Consolidated Mining Company, with said George H. Taylor in his individual capacity. That in good faith the same were left and intended to be left with the defendant for the purposes as hereinabove found, and that the same was within the apparent scope of the authority and incidental and implied powers which the defendant held out its said agent, Taylor, to possess as its representative and manager of defendant's said branch business."

The previous findings referred to by the court were to the effect that, at the time Mrs. Sullivan paid for the stock, she

requested Taylor, as manager of defendant's Eureka branch office, to have the defendant Evans-Morris-Whitney Company retain the certificates for her, so that she could be advised if any assessments were levied upon said stock and also so tnat said stock could thereafter be sold by the defendant upon her order.

If the finding above quoted is sustained by the evidence, the judgment of the trial court should be affirmed. There ought not to be any serious doubt, as we view the evidence, that both Mrs. Sullivan and the plaintiff thought they were leaving the stock in the hands of the defendant company; that they intended to do so, and thought they had done so, is the only rational conclusion that can be drawn from the evidence. There was nothing in the relationship between the Sullivans and Taylor or in their knowledge or previous acquaintance with him that can justify a well-founded belief that they had any business whatever with him in his individual capacity. If they must be held to have done this business with him in his individual capacity, it will be because of some principle of law, and not because it was within the compass of their actual intentions. Of this we are fully convinced, and therefore we feel compelled to hold that so much of the finding above quoted as relates to that question is fully sustained by the evidence. But is defendant bound by Taylor's assumption of authority to receive the stock for the purposes shown in the evidence? This seems to be the crucial question.

The defendant company had placed Taylor in charge of its branch place of business in Eureka, it had clothed him with the title of manager, and advertised him as such in more ways than one. The term "manager," as applied to corporations and business concerns, is not unknown to the law. It has a comprehensive meaning which is generally understood:

" 'Manager,' as applied to an officer of a corporation, implies the idea that the management of the affairs of the company has been committed to him, so that one dealing with a person so held out, before the company can be held liable for his acts, need not show affirmatively that it had authorized them."

And again:

" 'Manager,' as applied to an officer of a corporation, conveys the idea that to the one thus named has been committed the management of the affairs of the company, and one dealing with the person so held out may assume that his acts are authorized." 5 Words and Phrases, p. 4319.

It must be admitted, even by the defendant itself, that the extensive advertising given by it to its manager in Eureka was well calculated to impress the people of that community with the idea that Taylor was authorized to transact most any kind of business relating to stock transactions that defendant could do if personally present. He was to all intents and purposes, as far as outward appearance was concerned, a trusted officer of the company, charged with the control of its business in the Tintic district and clothed with the power ordinarily incident to one charged with the management of a business concern. The people of the district had been informed by advertisements in various forms that this branch place of business had been established for their accommodation and to facilitate the business of the company. The advertisements disclosed no limitations or restrictions as to the authority of Taylor as manager. Hence it seems to us that plaintiff and his mother were justified in dealing with Taylor in relation to stock transactions as they might have dealt with the company direct in Salt Lake City. Mrs. Sullivan testified positively that she had on several occasions, when purchasing stock from the defendant company, left the stock in its hands subject to her future orders and directions; that the company had retained such stock in its possession in some instances from a year to a year and three months before delivering it to her; that it was not stock bought on margins and left as security for payment, but stock actually bought and paid for. Such a proceeding, after all, it seems to us, is clearly incident to the buying and selling of stock, especially where a person buys for the purpose of selling as soon as a reasonable profit can be obtained. Mrs. Sullivan said it was her usual custom to leave the stock purchased with the broker, not only with the defendant when she dealt with it, but with other brokers with whom she did business. As before stated,

in view of the apparent authority of Taylor, and her knowledge of the way business had been done in the past, Mrs. Sullivan was clearly justified in directing Taylor to have the defendant retain the stock in its possession subject to her order at some future time. It follows as a corollary from the proposition just stated that a direction given to Taylor was a direction to the company itself, and the company should be bound thereby. Mr. Mechem, in his work on Agency, Vol. 1 (2d Ed.) section 737, speaking of general and special agents, says:

"In either case, the question of the authority of the agent must depend, so far as it involves the rights of innocent third persons who have relied thereon, upon the character bestowed, and not merely upon the instructions given or upon the authority as it was declared to the agent in express terms. In other words, the principal is bound to third persons who have acted in good faith and in justifiable ignorance of any limitations or restrictions, by the authority he has apparently given to the agent, and not by the express or declared authority where that differs from the apparent, and this, too, whether the agency be a general or a special one."

See, also, cases cited in the note.

Again, in section 739, same volume, the same author states the rule as follows:

"On the other hand, where the agent is authorized to transact all the principal's business of a certain kind, or all the acts of a certain class, the very breadth of the employment, the duration of time involved, and the variety of the duties to be performed necessarily involve more or less of discretion and choice of methods, and render impracticable, if not impossible, much of particularity or precision, either as to the exact means and method to be employed, or as to the scope or extent of the authority itself. Where so little is expressed, more may well be implied. The fact of such an authority, of itself, presupposes a general confidence bestowed upon the agent, and a general committal to his discretion and judgment of all beyond the essential objects to be attained and the outlines of the course to be pursued. It may not unreasonably be presumed, where nothing is indicated to the contrary, that such an agent possesses those powers which are commensurate with his undertaking, and which are usually and properly exercised by other similar agents under like circumstances. This presumption may well be and is constantly relied upon by persons dealing with such agents, and so reasonable, proper, and necessary is this reliance, that it may justly be required that, if the principal would impose

unusual restrictions upon the authority of such an agent, he should make them known to persons who may have occasion to deal with the agent."

These principles, as stated by respondent, are elementary. It is unnecessary to consider authorities at length, especially as appellant has cited none which in any manner contravene the doctrine declared in the excerpts above quoted.

We would not deem it necessary to proceed further with this discussion, were it not for the purpose of emphasizing our views concerning some of the features of this extraordinary case. The defendant, at the trial of the case, had its Eureka manager, Geo. H. Taylor, sworn as a witness in its behalf. He testified that he had no authority to receive the stock in question for the purpose alleged in the complaint. While his entire testimony showed that he was as unblushing in his deception practiced upon his principal as he was unconscionable in his treatment of the Sullivans, nevertheless he tried to compensate his employer for the deception practiced by testifying to every possible thing that might tend to relieve it of liability for the wrongs complained of. He admitted, in effect, that he took the Columbus Extension stock which Mrs. Sullivan had ordered transferred to plaintiff and sold it, in June, 1916, and pocketed the proceeds. He admitted that he sold it in her name, received the check issued to her in payment for the stock, and without authority indorsed her name on the check in order to obtain the money. He admitted, also, that he informed plaintiff that the stock had been transferred to plaintiff's account; that after he sold it he, in the month of July, following, collected from the plaintiff a pretended assessment on the property in the sum of $20; that he repeated the performance in the following November and again in April, 1917, and in each instance converted the money to his own use. During all of this time he was lulling plaintiff into a feeling of security and leading him to believe that his stock was being looked after and cared for by the defendant company. The delusion was kept up and the farce continued even down to the very moment he gave to the plaintiff his worthless check under the pretense that the stock had been sold in pursuance of plaintiff's direction. It sometimes

happens in human affairs that a person will wrongfully convert the property of another under circumstances of the grossest fraud, but, this is the first case in the experience of the writer in which the evil doer wrongfully converted the property of another and afterwards presumed to levy and collect from his victim successive assessments upon the property so converted. As an instance of moral obliquity, as far as we are informed, the case has no parallel in the annals of human frailty. We believe that morally the defendant is entirely innocent; that it, too, was a victim of the dishonesty of its own trusted agent. We believe defendant's character as a business concern is above reproach; but one or the other of these parties must suffer the consequences of Taylor's dishonesty, and we have no dubiety in arriving at the conclusion that the burden should fall upon the party that held Taylor out and gave him the character and standing of an honest man.

The trial court, in view of all the facts of the case, treated the acts, conduct, and omissions of Taylor as the acts, conduct, and omissions of the defendant company and arrived at the conclusion that the defendant, as matter of law, was estopped from asserting its wrongful conversion of the property as a defense to plaintiff's action. We are of the opinion the court was justified in the conclusion arrived at.

The judgment is affirmed, at appellant's cost.

CORFMAN, C. J., and WEBER and GIDEON, JJ., concur.

FRICK, J.

I concur. At first blush I was strongly of the impression that this was a case where certain stock was deposited with the agent for safe-keeping, when, in view of the business conducted by his principal, the agent's authority was limited to receiving stock for sale and for delivery to the principal's customers only, and not as a depositary of stock. A careful consideration of the record, however, has convinced me that the stock was intrusted, and intended to be intrusted, to the principal and not to the agent, and that the agent had at

least the apparent authority to transact on behalf of the principal the business intrusted to him by the plaintiff with regard to the stock in question. From these conclusions the result reached by my associate, Mr. Justice THURMAN, necessarily follows.