STUCK et al. v. DELTA LAND & WATER CO.

No. 3914.   Decided March 11, 1924.   On Rehearing July 9, 1924.
(227 Pac. 791.)

1. FRAUD—ELEMENTS OF "ACTUAL FRAUD" STATED. Elements of "actual fraud" consist of (1) a representation; (2) its falsity; (3) its materiality; (4) speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by person and in manner reasonably contemplated; (6) hearer's ignorance of its falsity; (7) his reliance upon its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.

2. FRAUD—OPINION NOT ACTIONABLE. A representation which is a mere expression of opinion is not actionable.[1]

3. FRAUD—EVIDENCE AS TO REPRESENTATIONS ADMISSIBLE. In an action for damages for fraud in sale of water right, if there was a reasonable doubt as to whether representations were actionable as distinguished from mere expressions of opinion, it was court's duty to admit them in evidence.

4. FRAUD—WHETHER REPRESENTATION WAS OF AN EXISTING FACT HELD FOR JURY. In an action for damages for fraud in sale of water right, whether or not defendant's representations that land in a certain valley was "a thoroughly proven general farming district" was a representation of an existing fact upon which plaintiffs, in entering uncultivated land, were entitled to rely, held for jury.

---

[1] Campbell v. Zion's Co-op. Home Building & R. E. Co., 46 Utah, 1, 148 Pac. 401; Hecht v. Metzler, 14 Utah, 408, 48 Pac. 37, 60 Am. St. Rep. 906.

5. TRIAL—CIRCULARS CONTAINING ALLEGED MISREPRESENTATIONS PROPERLY ADMITTED, WHERE NO ATTEMPT MADE TO EXCLUDE INADMISSIBLE PORTIONS. In an action for damages for fraud in sale of water right, where no suggestion was made to segregate statements made in circulars containing the false representations so as to exclude only such as may have been inadmissible, court did not err in admitting circulars in evidence.

6. FRAUD—REPRESENTATIONS AS TO QUALITY OF LAND NOT INADMISSIBLE AS EXPRESSIONS OF OPINION. In an action for damages for fraud in sale of water right, statements of defendant's agents that land plaintiffs were induced to enter contained no alkali, and that a substance seen therein was gypsum, were not inadmissible as expressions of opinion.

7. FRAUD—LIABILITY FOR MISREPRESENTATIONS NOT AFFECTED BY INVESTIGATION OF LAND. Where defendant's agent, in inducing plaintiff to enter land and purchase water right, misrepresented that land contained no alkali, which involved a question of technical knowledge, that plaintiff made some investigation and went on the land did not affect defendant's liability for such representation.

8. PRINCIPAL AND AGENT—EVIDENCE HELD TO SHOW THAT PARTIES WERE SELLING AGENTS, AUTHORIZED TO NEGOTIATE SALES OF WATER STOCK AND PROCURE ENTRYMEN FOR LAND. Evidence held to show that parties making representations concerning land were selling agents, authorized to negotiate sales of water stock in connection with land and to procure entrymen therefor.

9. PRINCIPAL AND AGENT—AGENTS HELD ACTING WITHIN SCOPE OF AUTHORITY IN MAKING REPRESENTATIONS AS TO QUALITY OF LAND. Where principal business of selling agents was to extol virtues of land with view of procuring purchasers of water stock sold in connection therewith, such agents were acting within apparent scope of their authority in making representations as to the quality of land.

10. PRINCIPAL AND AGENT—DEFENDANT BOUND BY ANY REASONABLE REPRESENTATION OF FACT AGENTS MADE IN EFFECTING EXCHANGE OF PROPERTY. Where defendant clothed agents with apparent power of selling agents, and sent them forth to induce persons to become purchasers of defendant's property, defendant was bound by any reasonable representation of fact such agents might make concerning the property with a view of effecting an exchange.

11. PRINCIPAL AND AGENT—RATIFICATION OF DEFENDANT'S AGENTS' FRAUD NOT SHOWN BY DEFENSE OF ACTION AND FILING OF COUN-

TERCLAIM. In an action for damages for fraud in sale of water right, defendant did not, by defending action and interposing counterclaim for false representations concerning land taken in payment, ratify and adopt entire transaction, where it not only alleged that agents' representations in effecting exchange were not within apparent scope of their authority, but also that they were not made, especially as Comp. Laws 1917, § 6577, required defendant to assert its claim to damages, if any were had, by way of counterclaim or be forever barred.

12. APPEAL AND ERROR—INSTRUCTION ON AGENTS' AUTHORITY IN EXCHANGE OF LAND HELD NOT PREJUDICIAL. In an action for damages for fraud in exchange of water right for land, an instruction that defendant was liable for acts of its agents because it claimed the benefit of the transaction, *held* not prejudicial, where such agents acted within apparent scope of their authority in making representations inducing plaintiffs to make exchange.

13. TRIAL—INSTRUCTION DISREGARDING APPARENT SCOPE OF AGENTS' AUTHORITY PROPERLY REFUSED. In an action for fraud in exchange of land, an instruction that defendant was not liable for its agents' representations, unless made within scope of their authority, was properly refused, because disregarding apparent scope of their authority.

14. APPEAL AND ERROR—ADMISSION OF EVIDENCE AND INSTRUCTION ON DAMAGES HELD NOT PREJUDICIAL, WHERE JURY AWARDED LESS THAN TRUE MEASURE OF DAMAGES PERMITTED. In an action for damages for fraud in exchange of water stock for lands, admission of evidence of value of plaintiffs' land and an instruction that measure of damages was difference between the fair market value thereof and of the water right and land acquired in connection therewith, was not prejudicial, under Comp. Laws 1917, § 6622, where jury awarded plaintiffs less than true measure of damages properly permitted.[2]

15. FRAUD—WATER CERTIFICATES ADMISSIBLE TO SHOW THEY HAD NO VALUE APART FROM LAND. In an action for damages for fraud in sale of water stock, the certificate, reciting that it was dedicated to and appurtenant only upon land acquired in connection therewith, was admissible to show extent of plaintiff's water right and thus show its worthlessness when the land was worthless, where defendant was afforded ample opportunity to show value of such stock apart from land.

16. APPEAL AND ERROR—JURY'S VERDICT NOT SET ASIDE, IF WITHIN THE EVIDENCE AND NOT OBVIOUSLY INCONSISTENT THEREWITH. A

jury's verdict will not be set aside, if amount is within the evidence and not obviously inconsistent therewith.

17. FRAUD—DAMAGES HELD WITHIN EVIDENCE. In an action for damages for fraud in the exchange of water stock for land, a verdict for $14,845 was within evidence, where plaintiffs appraised the lands exchanged by them at approximately $21,000, and showed expenditures in connection with the transaction amounting approximately to $3,000, and there was evidence that the water right was worthless.

On Rehearing.

18. TRIAL—INSTRUCTION HELD NOT ERRONEOUS IN VIEW OF OTHER INSTRUCTIONS. In an action for damages for fraud in exchange of lands, an instruction was not erroneous in failing to state that false representations of defendant's agents upon which plaintiff relied were made by such agents with knowledge of their falsity, where jury, was properly instructed in other instructions, and an instruction was given that all instructions were to be construed and considered together as a whole.

19. APPEAL AND ERROR—PRESUMED. THAT JURY CONSIDERED ALL INSTRUCTIONS, UNLESS CONTRARY IS MANIFESTED. Appellate court must presume that jury considered all of court's instructions, unless contrary is clearly manifested.

20. FRAUD—REPRESENTATIONS AS TO QUALITY OF LAND HELD ACTIONABLE. Where agents in making a representation as to quality of land either knew they were making a false representation and did it with intent to deceive, or knew nothing about the matter, and were recklessly affirming as a fact something of which they were entirely ignorant, it was a false representation in contemplation of law.

21. FRAUD—RELIANCE ON REPRESENTATIONS HELD FOR JURY. In an action for damages for fraud in exchange of water right for land, whether plaintiffs relied on representations of defendant's agents in making exchange held for jury.

Appeal from District Court, Fifth District, Millard County; *Wm. F. Knox*, Judge.

Action by William H. Stuck and Henry Stuck against the Delta Land & Water Company. Judgment for plaintiffs, and defendant appeals.

2 *Hecht* v. *Metzler*, 14 Utah, .408, 48 Pac. 37, 60 Am. St. Rep. 906.

AFFIRMED.

*William Story* and *T. Marioneaux*, both of Salt Lake City, for appellant.

*Frank Evans, Dey, Hoppaugh & Mark* and *Walton & Walton*, all of Salt Lake City, for respondents.

THURMAN, J.

The pleadings in this case are voluminous, but it is not necessary to state them in detail. The transcript of the evidence having been misplaced and not available, we are compelled to rely upon appellant's abstract on appeal.

At all times mentioned in the pleadings the defendant company was engaged under the laws of Utah in the operation of a "Carey Act" project in what is known as the Pahvant Valley in Millard county, Utah. The plan was to permit each person to enter not exceeding 160 acres of land with the state board of land commissioners, and in connection therewith to purchase from the defendant company 160 shares of the capital stock of the Delta Canal Company at the rate of $70 per share, which shares of stock would represent a water right for the land so entered equivalent to one and one-half acre feet of water for each acre of land. In addition to this the purchaser was to pay annual dues for maintenance of the water supply.

In 1915 the Western Securities Company, a corporation, was sales agent for the defendant both in Millard county, Utah, and in the state of California, and by way of advertising the business published and circulated in both states circulars intended to induce purchasers to become interested in the said project. These circulars came into the hands of the plaintiffs, father and son, who resided at Garden Grove, Orange county, Cal., and who were owners of land at that place part of which had been planted to oranges. They became interested in the contents of the circulars so published by defendant and statements made by persons purporting

to be agents of the defendant in California, and concluded to come to Utah with the view of investing in said project, if their further investigations should prove satisfactory. They came to Utah in the fall of 1915 in company with one of said purported agents, a Mr. Murphy, employed by the said Western Securities Company in selecting lands for entry and in promoting sales of the said capital stock. Murphy, Dunn, and one McClain, also in the same employment, conducted the plaintiffs to numerous cultivated farms in the district, and introduced them to many of the farmers, all of whom spoke in terms of laudation concerning the project, and enumerated instances of abundant crops raised on the land. After exhibiting the productivity of the cultivated lands and learning from the settlers its capability for farming purposes, the aforesaid agents conducted plaintiffs to a tract of unoccupied land in the northern part of the district where there were two pieces of land open for entry. It is claimed, by plaintiffs that Murphy before leaving California had assured them that the lands open for entry were just as good as any of the lands referred to in the circulars published by defendant, and would grow the best crops of the kind mentioned in said circulars, and would continue to grow better from year to year; that the only thing required for any of said lands was water, and that the quantity to be furnished by defendant would be sufficient for any kind of crop; that there was no injurious substance in the soil; and that every 40 acres of the land had been examined. It is also claimed by plaintiffs that while examining the unoccupied lands afterwards entered by them they discovered in some places thereon a white substance which they thought was alkali and called the same to the attention of Murphy and McClain, with inquiry concerning the same. Plaintiffs allege they were assured by them that it was not alkali but gypsum and was not injurious to the land, and that the soil had been duly tested. Relying upon the representations made in the circulars and by the individuals purporting to represent the company aforesaid, it is alleged by the plaintiffs and testified to by them that they each entered 160

acres of land and purchased 150 shares of the aforesaid capital stock representing water rights therefor. They each paid to the Utah state board of land commissioners the initial fee of 25 cents per acre for the land so entered, and paid the defendant for the capital stock at the rate of $70 per share by exchanging therefor 20 acres of their land at Garden Grove, Cal., at the agreed price of $21,000. Plaintiffs immediately thereafter moved from California to and upon the land they had entered made improvements thereon, and in the year 1916 cultivated a portion thereof and attempted to raise crops thereon. It is alleged and testified to by them that their crops were almost, if not an entire, failure on account of excessive quantities of alkalki in the land; that the substance represented by Murphy and McClain to be gypsum and not injurious to the soil proved to be alkalki in such quantities as to render the land unfit for the production of any kind of agricultural crops. It is further alleged and testified to by plaintiffs that the water rights purchased by them were wholly worthless, not only because of the character of the soil, but also because said water rights are limited to and appurtenant to the particular land entered by them as shown by the certificates of stock issued to plaintiffs which contain the following clause: "This water is dedicated to and appurtenant to and shall be used only upon the land above described" (meaning the lands entered by plaintiffs). Plaintiffs discontinued their efforts to crop the land after their failure in 1916, and since that time have not used the land for any purpose or the water rights represented by their certificates of stock.

Plaintiffs sue in this action to recover damages both actual and exemplary in the sum of $65,700, basing their right of action upon the alleged false representations of the defendant as to the quality of the land as appears in the circulars referred to and statements made by defendant's agents by which they were induced to enter the land and purchase the stock. The contents of the circulars referred to in the foregoing statement were set out in part in the complaint. For the sake of brevity we have omitted them in this connection,

but will state them hereinafter as they appear in the complaint.

The answer of defendant, briefly stated, admits the existence of the Carey Act Project and defendant's relation thereto. It admits that the Western Securities Company was its agents, and that plaintiffs entered the land in question and purchased water stock by exchanging therefor their California land as alleged in the complaint. It denies the agency of Murphy, Dunn, and McClain, and denies specifically every allegation of the complaint tending to show defendant's liability for the alleged wrongs of which plaintiffs complain. Defendant also filed a counterclaim for damages alleging false and fraudulent representations concerning the California land. At the close of plaintiffs' evidence the counterclaim was dismissed on motion of the defendant.

Prior to the filing of its answer defendant moved to strike from the complaint certain allegations thereof, particularly such as may have indicated mere expressions of opinion as to the quality of the land and predictions as to its productivity. The motion to strike was denied, and defendant's demurrer filed therewith was overruled.

The trial of the case to a jury resulted in a verdict for plaintiffs in the sum of $14,845. Motion for a new trial was denied, and final judgment entered from which judgment defendant appeals.

Appellant in its brief defines the paramount issues to be:

"(a) As to whether the plaintiffs in the selection and entry of their land relied upon and were deceived by the statements in the pamphlets, which admittedly referred to no particular tract' of land, but merely to the Pahvant Valley as a whole;

"(b) As to whether Murphy, Dunn, or McClain made the statements attributed to them by plaintiffs in respect to the productivity of the lands or the absence of alkali in the soil; and, if so, their authority to bind the defendant by such representations as well as to whether the plaintiffs relied upon and were deceived by their statements;

"(c) As to whether the land entered by the plaintiffs was in fact worthless for agricultural purposes, and, assuming it to be so, was the water right represented by the shares of stock so irrevo-

cably attached to and a part of the land as to be wholly useless and of no value for that reason;

"(d)   As to the measure of the plaintiffs' damages, assuming their right to recover in the action."

The pamphlets referred to in subdivision (a), supra, are the circulars to which reference has been made in the foregoing statement. They are designated in the record as Plaintiffs' Exhibits 1 and 2. Appellant objected to their admission in evidence and afterwards moved that they be withdrawn from consideration by the jury. . The objection was overruled, the motion denied, and exception reserved. We quote in this connection such portions of the pamphlets as are set forth in plaintiffs' complaint:

"An Introduction by C. R. Stuart.

"In December, 1914, I was commissioned to go to Pahvant Valley, Utah, and interview the first 20 to 30 farmers I saw. I was instructed to secure from them, if possible, written statements and facts duly signed and properly acknowledged before a notary public relative to the Pahvant Valley soil, the water conditions, climatic advantages, transportation facilities, markets, etc.

"During the week I spent in Pahvant Valley I interviewed 21 farmers—the first 21 men I saw. I didn't know one man from another—never saw one of them before. I went direct to their farms and secured their written, sworn statements, straight from the shoulder facts about results obtained.

"The men were selected at random, and their statements were given in an easy, offhand way. They were reduced to writing in the form of testimonial letters, and eleven of them are reproduced in this booklet.

"The Free Services of Two Prominent Soil, Crop, and Irrigation Experts at the Disposal of All Purchasers.

"One of the ablest irrigation engineers and one of the best soil and crop experts in the west is employed by the company to co-operate with all settlers.

"His time is devoted entirely to assisting farmers in solving their various problems. His advice on all matters pertaining to practical, scientific farming is absolutely free to all purchasers of land.

"Pahvant Valley in Southwestern Utah.

"On main line of Salt Lake Railroad. $70 per acre for land and perpetual (gravity) water right.

"Pay $25 an acre cash—Balance in 10 equal annual payments.

"A thoroughly proven general farming district.

"A valley of enthusiastic, contented settlers.

"A valley of abundant crop yields.

"A valley of prosperity.

"A 'No. 1' alfalfa country.

"The best alfalfa seed district in the west.

A remarkable grain country.

"Why Farmers Have Succeeded in Pahvant Valley.

" 'Because the soil is deep, rich, and responsive.'

"Because Pahvant Valley lands produce bumper crops of alfalfa, alfalfa seed, grain, sugar beets, etc.

"Because one crop of sugar beets alone has netted Pahvant Valley farmers the entire cost of the acreage which they planted.

"Because alfalfa seed has returned more than $100 in seed alone on one acre in one year.

"Because Pahvant Valley farmers have soil and agricultural experts to advise and guide them.

"Alfalfa seed from Pahvant Valley farms is shipped all over the country.

"Read carefully the following sworn statements, under oath, of men not engaged in selling farm lands, who have no object in giving testimony other than to guide their fellowmen to where opportunity waits.

"These are messages of neighborliness—your prospective neighbors speaking to you, telling you what they have done, the success they have made—honest, simple, straightforward facts that will eventually be proven to you when you come to Pahvant Valley.

"You will meet these men when you go to Pahvant Valley, these men and scores of others equally successful and enthusiastic.

"Prosperity Pictures in Pahvant Valley.

"Actual scenes on lands we have sold, photographed three weeks ago by Livingston of Los Angeles."

Then, as alleged in the complaint, there follows in said circular pictures of a prosperous farming community with harvest scenes, scenes of thinning sugar beets, and beautiful farm buildings. And following the pictures in said circulars appears the following:

"Go to Pahvant Valley and meet the ranchers shown above face to face. Talk direct to them and scores of other California ranchers. Let them tell you about conditions as they know them from actual experience.

"It is now harvest time, and the real proof of what these rich lands will do is in evidence everywhere. Dig into the deep, rich soil. Investigate the $1,000,000 gravity irrigation system. See wheat fields that will yield better than fifty bushels to the acre.

See sugar beet fields that will average twenty-five tons to the acre. See thousands of sleek hogs on all sides.

"You'll see another Imperial Valley, with none of that section's drawbacks. Pahvant Valley has high elevation, delightful climate, pure lithia drinking water, mild health-giving winter climate, cool summer nights."

It is then further alleged in the complaint:

"That by all of said advertising literature the defendants intended to and did imply and cause plaintiffs to believe that the lands which the defendants would select and procure for the plaintiffs in said Pahvant Valley were rich, fertile, and of the character of land described in said advertising pamphlets and circulars."

Appellant's contention is that the contents of these circulars are mere expressions of opinion and not representations of fact, and therefore afford no basis for an action for damages. In support of its objection to the admissibility of the exhibits as evidence appellant indulges in a lengthy discussion of the elementary principles involved in an action of this kind. The principles referred to are more tersely stated in 26 C. J. 1062, cited by appellant, from which we quote the following:

"It may be stated generally that the elements of actual fraud consist of: (1) A representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance upon its truth; (8) his right to rely thereon; (9) his consequent and proximate injury."

The foregoing principles in actions for fraud, except as they may be, and have been modified by the facts and circumstances of the particular case, are matters of common knowledge among members of the bar and judicial tribunals of the country. Counsel for appellant, in their illuminating brief, cite numerous authorities, both text-writers and judicial decisions, illustrative of the principles referred to, and quote therefrom at considerable length. It is impracticable within the limits of an opinion of ordinary length to review all of the authorities cited by appellant relating to this question. It is practicable, however, to refer to the rule as enunciated by standard authorities to which

appellant has invited our attention. Appellant quotes from Addison on Torts (Wood's Ed.) § 1186. The work is not conveniently accessible, hence the writer quotes from appellant's brief:

"If the representation is as to a matter not equally open to both parties, it may be said to be a statement of fact as such; but if it is as to a matter that rested merely in the judgment of the person making it, and the means of deriving information upon which a fair judgment can be predicated are equally open to both parties, and there is no artifice or fraud used to prevent the person to be affected thereby from making an examination and forming a judgment in reference to the matter for himself, the representation is a mere expression of opinion, and, however incorrect, does not support an action for fraud. Generally statements as to the value of property, real or personal, which the purchaser has an opportunity to inspect for himself, and in reference to which, upon reasonable inquiry, he could ascertain facts upon which to predicate a fair judgment, are mere expressions of opinion, and, however erroneous or false even, are not actionable. In reference to all such matters, where the opportunities for information are equally within the reach of both, the doctrine of caveat emptor applies."

Appellant also quotes from the same author, same edition, section 1175:

"In determining whether the representations are mere expressions of an opinion or statements of fact as such, reference must always be had to the subject-matter to which they relate, the circumstances under which they were made, and the difference in the means of knowledge in reference to the matter between the plaintiff and the defendant. If the plaintiff ought, by reasonable diligence, to have known the truth or falsity of the statements, or had equal facilities for knowing as the defendant, he cannot, by blindly believing where he ought not to have believed, or trusting where he ought not to have trusted, or shutting his eyes when he ought to have kept them open, charge the defendant with the consequences of his folly. Each man is bound to exercise his judgment when he can do so; but when the means of forming a correct conclusion are peculiarly possessed by him, then, if that person misrepresents and deceives another to his damage, he is liable, otherwise not."

Appellant also quotes the following excerpt from Black on Rescission and Cancellation, § 113:

"It is a rule of great antiquity, and supported by a great body of authorities, that a person about to enter into a contract or as-

sume an obligation should exercise reasonable care and prudence in the matter of accepting at their face value representations concerning the subject-matter made to him by the opposite party; and, although the representations were false and fraudulent, and he was deceived by them and misled to his injury, yet he cannot rescind or repudiate his contract on that ground, if it appears that he might have discovered their falsity by mere inspection of the subject, or by the exercise of reasonable diligence in referring to sources of information which were equally open to him as to the other party. There are exceptions to this rule: * * * Where a fiduciary relationship subsisted between the parties, where the matter was exclusively within the knowledge of one of them, where an examination of the subject-matter would require unusual pains, expense, or trouble, and involve special training or technical knowledge, and so on. But in the absence of such circumstances the rule applies that, where the subject-matter of false representations is at hand, and the truth easily ascertainable, one cannot be heard to say that he has been defrauded by such representations if he neglected to avail himself of a present and reasonable opportunity to learn the truth."

In Pomeroy's Equity Jurisprudence (3d Ed.) § 892, the author distinguishes the cases in which a party is justified or not justified in relying upon alleged fraudulent representations:

"(1) When, before entering into the contract or other transaction, he actually resorts to the proper means of ascertaining the truth and verifying the statement; (2) when, having the opportunity of making such examination, he is charged with knowledge which he necessarily would have obtained if he had prosecuted it with diligence; (3) when the representation is concerning generalities equally within the knowledge or means of acquiring knowledge possessed by both parties; (4) but when the representations concerning facts of which the party making it has, or is supposed to have, knowledge, and the other party has no such advantage, and the circumstances are not those described in the first or second case, then it will be presumed that he relied on the statement."

In Addison on Torts (6th Ed.) American Notes by Baylies, § 796, the author says:

"When the representation is made concerning something which is mere matter of opinion, which every man can exercise his own judgment upon and inquire about, it is the plaintiff's own fault if he suffers himself to be deceived."

In the same work, section 798, it is said:

"If a man undertakes positively to assert that to be true which he does not know to be true, and which he has no grounds for believing to be true, in order to induce another to act upon the faith of the representation, and the representation is acted upon and turns out to be false, and the person who has acted upon it has been deceived and damnified, he is entitled to maintain an action for compensation. Whoever pretends to positive knowledge of the existence of a particular fact, when in truth he knows nothing at all about it, does in reality make a willful misrepresentation, which he knows to be false; and, if the representation is made in order that another may rely upon it and act upon it, and it is acted upon, and damage flows from the false representation, the person making it is, in principle, guilty of willful deception and fraud."

The excerpts quoted undoubtedly reflect the general rule. Appellant's counsel also cite, and quote from numerous adjudicated cases, among which are two Utah cases dealing with the question of fraudulent representations. *Campbell v. Zion's Co-op. Home Building & R. E. Co.*, 46 Utah, 1, 148 Pac. 401, and *Hecht v. Metzler*, 14 Utah, 408, 48 Pac. 37, 60 Am. St. Rep. 906. These two cases are very instructive in illustrating when a false representation is actionable and when it is not; in other words, when the representation is a mere expression of opinion and when it is a representation of fact.

Counsel for appellant also refer us to cases from other jurisdictions, many of which involve alleged fraudulent representations in the sale of land and tend to illustrate appellant's theory of the instant case. Such, for instance, are the following: *Ott v. Pace*, 43 Mont. 82, 115 Pac. 39; *Lee v. McClelland*, 120 Cal. 147, 53 Pac. 300; *Randell v. Scott*, 70 Cal. 514, 11 Pac. 779; *Holton v. Noble*, 83 Cal. 7, 23 Pac. 58; *Parker v. Moulton*, 114 Mass. 99, 19 Am. Rep. 315; *Gordon v. Parmelee*, 2 Allen (84 Mass.) 212; *Saxby v. Southern Land Co.*, 109 Va. 196, 63 S. E. 423; *Hegdale v. Wade*, 78 Or. 349, 153 Pac. 107; *Doukhobors v. Hecker*, 83 Or. 65, 162 Pac. 851; *Merritt v. Dufur*, 99 Iowa, 211, 68 N. W. 553, and other cases.

In many of the cases cited the representations relied on were undoubtedly mere expressions of opinion. In *Merritt v. Dufur*, supra, some of the representations were regarded

as representations of fact, but as to these there was a conflict of evidence, and judgment was entered for the defendant. On appeal the judgment was affirmed.

*Hegdale* v. *Wade,* supra, relied on by appellant as peculiarly applicable, was also a case in which many of the representations were treated as representations of fact, but they were denied by the defendant, and judgment was entered in his favor. The judgment was affirmed. There are other cases among those above mentioned that are not helpful to the court because they are distinguishable for reasons similar to those above mentioned. Our time will not permit an extended review, nor is it necessary, as the cases speak for themselves.

The immediate question before the court is the admissibility of the circulars in evidence. It will be conceded, no doubt, that, if there is a reasonable doubt as to whether any of the representations made in the circulars were actionable representations, as contradistinguished from mere expressions of opinion, it was the duty of the court to admit them in evidence. The court would not be justified in rejecting them as evidence, unless the representations were undoubted expressions of opinion. Our attention is called to the rule on this point as stated in 27 C. J. at page 74:

"When the form of a statement and the subject-matter of the circumstances under which it was made are such that it cannot fairly be construed as anything but an expression of opinion or belief, it is proper for the court so to hold, and to refuse to submit the question to the jury. But, if, as is often the case, a statement is of such a nature that it may be interpreted either as a mere expression of opinion, or as a statement of fact, and there is any question as to how it was intended and understood, whether it amounts to fraud or not is a question of fact, and is for the jury. So ordinarily it is for the jury to say whether representations as to value, solvency, or a third person's financial ability are statements of fact or of opinion."

This brings us to a consideration of the contents of the circulars. Undoubtedly nearly all of the matter published therein is simply "puffing" setting forth in exaggerated form the excellent qualities of the land in Pahvant Valley

and its exceptional advantages for farming purposes. The circulars also contained numerous affidavits of the settler, wonderfully flamboyant and eulogistic. But the question is as to what extent, if any, should any representation set forth in the exhibit be relied on as an actionable representation. Such statements as were merely promissory, predictive, and unequivocal "puffing" were not representations upon which plaintiffs had a right to rely, however much they may have stimulated their desire to become partakers of the alluring advantages awaiting those who were wise enough to grasp the golden opportunity. Such representations appear to be considered to some extent as we consider the extravaganzas of a poet, whose license permits him to indulge in flights of fancy for which "some allowance should be made for shrinkage."

However, there is at least one statement in the circulars that purports on its face to be a representation of fact. It represents Pahvant Valley to be "a thoroughly proven general farming district." It is conceded by appellant that the representations in the circulars relate to the Pahvant Valley as a whole. This is obviously true, even if it were not conceded. Pahvant Valley as a whole means Pahvant Valley including all its parts. It certainly includes the lands entered by plaintiffs. The very purpose of the circulars obviously was to advertise the unoccupied lands which were open for entry. The cultivated lands had already been taken. So that, in view of the only possible purpose for which the circulars must have been published and circulated, it seems illogical to contend that the representations did not refer to every tract of land within the district, and especially to land open to entry. Just what was meant by "a thoroughly proven general farming district" is somewhat indefinite, especially as to the nature and character of the proof. Where valuable crops were being grown, that itself would be satisfactory proof; where crops had not        4
been grown, the fair implication is that the soil had at least been tested and found suitable for farming purposes, otherwise it could not be truthfully said that it was

"a thoroughly proven general farming district." Whether or not it was a representation of an existing fact upon which the plaintiffs were entitled, to rely was, under all the circumstances, a question for the jury to determine.

It does not appear that any suggestion was made to segregate the statements made in the exhibits so as to exclude only such as may have been inadmissible. There was no error in admitting the exhibits in evidence nor in refusing to withdraw them from the consideration of the jury.

The next contention made by appellant is that the court erred in admitting, over defendant's objection, the alleged statements of Murphy, Dunn, and McClain as to the quality of the land and absence of alkali therein, and also erred in refusing to strike said evidence at the close of plaintiffs' case in chief.

The objections made by appellant are: (1) That the alleged statements, if made, were expressions of opinion, irrelevant and immaterial, and under the facts could not have been relied on by the plaintiffs, as they are presumed in law to have acted on their own investigations and judgment; (2) There is no evidence that the statements, if made, were within the actual or apparent scope of the authority of the agent making them; (3) the court, both in admitting the evidence and in its instructions to the jury, misconceived the principle of law applicable to the liability of a principal for representations of his agent in cases of this character.

Plaintiffs testified at the trial that Murphy, Dunn, and McClain unqualifiedly assured them at the time they were looking over the project that there was no alkali in the land which plaintiffs afterwards entered. They testified that Murphy had so stated before the plaintiffs left California. Plaintiffs also testified that other representations were made concerning the qualities of the land—that it was all similar—both the cultivated lands which were shown plaintiffs and the land open to entry.

The evidence as to these statements was objected to by defendant as irrelevant and immaterial. No objection was

made specifically calling the attention of the court or plaintiffs to the point that the authority of the agents to make such representations was in any manner involved. At one point in the testimony of the younger Stuck he said, speaking of McClain, ''I asked him a number of times about the land, about whether there was any alkali, and also about hardpan and gravel.'' Defendant moved to strike the answer in reference to hardpan and gravel as immaterial and irrelevant. At the close of plaintiffs' case in chief defendant moved to strike the alleged statements of the selling agents, Murphy, Dunn, and McClain, on the grounds that the statements were irrelevant and immaterial. No objection was made that there was no evidence that the alleged statements were within the actual or apparent scope of their authority. This question was not raised at all prior to the requests of defendant for instructions, unless it can be said that it is covered by the objection that the statements were immaterial and irrelevant. While we have serious doubts as to whether the objections made fairly include the question as to the authority of the agents, we will, nevertheless, consider in detail the objections as stated in defendant's brief.

1. Were the statements of the selling agents, Murphy, Dunn, and McClain, irrelevant and immaterial on the grounds that they were expressions of opinion and not representations of fact? Upon this question but little need be said. It is clearly covered by the rule already announced in this opinion. The rule is sustained by authorities quoted from appellant's brief. As far as the question of alkali is concerned, plaintiffs testified they were unfamiliar with alkali, especially on desert land. Whether or not a given substance is alkali can only be determined by experience or technical knowledge. Plaintiffs testified that when they inquired of these selling agents as to whether a certain substance seen upon the land they afterwards entered was alkali the agents informed them it was not alkali but gypsum and was not deleterious to the land. They also informed plaintiffs that every 40 acres of the land had been tested and that there was no alkali. These statements, together with the fact that it

involved a question of technical knowledge, undoubt-
edly brought the question within the doctrine of the    **6, 7**
authorities cited, especially Black on Rescission, § 113,
supra.   Nor does the fact that plaintiffs themselves made
some investigation of the project and went on the land alter
the rule.   The question was nevertheless one for the jury.
*Morrow* v. *Bonebrake,* 84 Kan. 724, 115 Pac. 585, 34 L. R. A.
(N. S.) 1147; *Lee* v. *Burnham,* 82 Wis. 209, 52 N. W. 255;
26 C. J. 1163 to 1166, inclusive.   Defendant's first ground
of objection—that the statements were irrelevant and imma-
terial—cannot be sustained.

2.   The next contention is that there is no evidence that the
statements, if made, were within the actual or apparent scope
of the authority of the agents making them.   We have already
referred to the fact that this specific objection was suggested
for the first time in defendant's request for instructions.
In defendant's motion to strike the testimony of plaintiffs
relating to the alleged statements of Murphy, Dunn, and
McClain counsel refers to them as selling agents, and such
they undoubtedly were.   Murphy testified positively that he
was a selling agent of the Western Securities Company,
and it is admitted in the pleadings that the Western Secur-
ities Company was a selling agent of defendant.   McClain
also testified that he was an agent of the Western Securities
Company.   Dunn does not so testify specifically, but the testi-
mony of all these men show conclusively that they were en-
gaged in inviting and inducing persons, including plaintiffs,
to make entries upon the land and purchase from the de-
fendant shares of stock in the Delta Canal Company as a
water right for said land.   That the very purpose of these
men in conducting plaintiffs and other persons to and upon
the land, both cultivated and uncultivated, was to induce
them to become purchasers of the water stock and entrymen
upon the land is conclusively established by their own testi-
mony as witnesses for the defendant.   That they were in **fact**
selling agents, as denominated by defendant's counsel in **his**
motion to strike, is equally well established.   They **were**
there evidently to show prospective purchasers the **land**

cultivated and uncultivated and the relation of the water thereto, and make such explanations as were necessary, and answer such pertinent questions as might be asked pertaining to the land and the water, all with the view of inducing purchase of the water stock and entrymen for the land. In this connection it is pertinent to state that no person was permitted to enter land in the project without purchasing from the defendant company the water stock in question. It is therefore manifest that the principal business of the selling agents was to extol the virtues of the land with the view of procuring purchasers of the water stock as a water right therefor. Taking the testimony of the selling agents themselves, even without that of the plaintiffs, it is impossible to view them in any other light than that of selling agents authorized to negotiate sales of the water stock and procure entrymen for the land. In these circumstances it cannot be consistently contended that they were not at least acting within the apparent scope of their authority in making the representations testified to by the plaintiffs. Is it conceivable that when these agents were conducting prospective purchasers over the land with the view of inducing them to enter a tract and purchase a water right therefor that they were not authorized to answer simple questions pertaining to the land? What would the prospective purchasers **8, 9** have surmised if the agent conducting them over the land had evaded or refused to answer a question as to whether or not a certain substance seen on the land was alkali? What would the prospective purchaser have thought if the agent had said, "I am not authorized to answer any questions as to the quality of the land or what it contains?" The idea that there was any such limitation upon the authority of the agent involves a bald absurdity and is manifestly unbelievable.

This brings us to a consideration of the law applicable to the question under review. Before entering upon a discussion of the law, we deem it fair to appellant to refer to one feature of the argument upon which appellant relies, and to which its counsel have evidently devoted considerable time and research.

The matter referred to pertains to the election of remedies where an action is grounded upon false and fraudulent representations. The difference between an action for rescission in equity and an action at law for damages is discussed at considerable length, and especially where the relation of principal and agent exists and the action is against the principal, founded upon the fraudulent representations of his agent. In such case, if the principal is innocent of the fraud, it is contended by counsel for appellant that an action of this kind will not lie against the principal, for the agent alone is accountable for the wrong. It is conceded, however, that in an action for rescission on the part of the vendee on the grounds of the agent's fraud the rule is different, for whenever the fraud of the agent is brought to the knowledge of his principal it is the duty of the principal to agree to a rescission so that both parties may be placed in statu quo.

The entire discussion of this question by appellant proceeds upon the theory that in the instant case there is a question as to whether or not the alleged statements of Murphy, Dunn, and McClain were within the actual or apparent scope of their authority. We have already assumed from the undisputed facts that these agents were authorized to effect sales of the property and are therefore what is known as selling agents. If in such cases the law holds the principal responsible for the representations of his agent, whether authorized or not, it necessarily determines the matter in question here without determining the consequences resulting from an election of remedies. As to the apparent scope of the authority of an agent authorized to negotiate sales of land we believe our position, already foreshadowed, is well sustained by authority.

In *Copeland* v. *Tweedle,* 61 Or. 303, 122 Pac. 302, which was a case wherein a selling agent misrepresented the quantity of timber on the land, the principal was held bound, although personally innocent of the fraud. At page 308 of 61 Or., at page 304 of 122 Pac., the court says:

"It is beyond dispute that this representation was made while Corcoran [the agent] was empowered by the defendant Ellen Tweedle to procure a purchaser for the land in question. It was

within the scope of his authority to describe the land to an intending purchaser and to state what it contained in the way of improvements or timber or the like. Without making some such representations, it would be impracticable to procure a purchaser. There is nothing in the writings between him and his sister limiting the usual and general authority thus given. The legal deduction from Corcoran's statement so made is that it affects the defendant Ellen the same as if she was there personally present and made it herself. She is bound by this representation of her authorized agent, it being within the fair and reasonable scope of his authority. She placed it in the power of Corcoran to make a misleading statement with intent to deceive, and, that being the case, she cannot complain if he did defraud the plaintiff. Corcoran was familiar with the land, had been over it, and knew the conditions there, and his knowledge on that subject is imputed to his principal, Ellen Tweedle. The plaintiff and her husband both testify that they relied upon him, and we think they had a right to do so, because they had not equal opportunities of knowing the truth. The land was situated in a remote part of Clatsop county, inaccessible except by a little used trail through the timber. Under these circumstances, therefore, the defendant Ellen must abide the result of her agent's misrepresentations. Although perfectly innocent of fraud herself, yet, having placed her brother in a position to defraud by putting her land in his hands for sale, the loss resulting from his deception must fall upon her as between herself and another equally innocent."

In Mechem on Agency (2d Ed.) § 1987, the author says:

"The principal may, either expressly or by implication, put the agent in such a position, or charge him with such duties, that the making of misrepresentations will fall within the scope of his authority, as where, expressly or by implication, he refers persons to the agent for information or authorized him to do acts to which the making of representations is a necessary or usual incident.

"Where the principal thus authorizes the making of representations, it may be proved or conceded that he intended the agent to make only fair and honest ones. But a power to make representations, although fair and honest ones only were intended or directed, involves the possibility of the making of false and fraudulent ones; and if the agent in such a case, while acting in the course of the principal's business, and for the purpose of promoting the principal's objects, and not those of the agent only, makes false and fraudulent representations concerning the subject-matter of his agency, not so extravagant, unreasonable or unrelated that a reasonably prudent man would not rely upon them, the principal will be responsible for them."

In *King* v. *Livingston Mfg. Co.*, 180 Ala. 118, at page 124, 60 South. 143, at page 154, first column, which was an action for damages for fraudulent representations by the agent of a corporation, the court says:

"If it was not a corporate act, not being specifically authorized by the board of directors, nor within the general scope of the manager's authority, then no case is made against the company, and it is not liable. It is to be noted, however, that, independently of the particular allegation quoted, the principal, who intrusts to an agent the duty of giving information to those interested therein, is liable to such persons for the consequences of false information given by the agent in the course of his employment, to the same extent as if given directly by the principal, even though the principal intended and directed that only true information should be given."

In *Matteson* v. *Rice*, 116 Wis. 328, 92 N. W. 1109, an action for damages by a lessee, the headnotes read:

"A landlord authorized the janitor of his flat building to exhibit the premises to prospective tenants, execute leases, place the tenant in possession, and collect the first month's rent. The tenant was induced to enter into lease of a flat by the janitor's false assurance, not amounting to a warranty, that a wall, not open to inspection, between the flat leased and an adjoining building, was fire proof. The janitor had no express authority to make representations or warranties. *Held*, that the landlord was liable to the tenant for loss of goods by fire, the representations in question being so far within the scope of the business of the agency as to be deemed authorized.

"The fact that the agent believed the representations to be true, and had no intention to deceive the tenant, would not affect the landlord's liability.

"While an agent may not do everything his principal may do, where a representation by the agent directly appertains to and becomes a necessary part of the transaction under consideration, and an inducement to its acceptance by the party to whom the representation is made, it may be said that such matter falls 'within the scope of the agency.'"

In *Sandford* v. *Handy*, 23 Wend. (N. Y.) 260, the first paragraph of the syllabus reflects the nature of the case and the opinion of the court:

"An agent empowered for a special purpose, e. g., to obtain subscriptions to a project, of forming a joint stock company in relation to lands, may use the ordinary means of accomplishing the object of his appointment; such as representing the location and

quality of the lands, and the like; and if he make false representations, inducing purchasers to enter into contracts, the principal is affected by such representations, the same as if made by himself."

In 31 Cyc. at pp. 1582, 1583, 1584, the text reads:

"The liability of the principal for torts committed by his agent is not limited to torts which he has expressly authorized or directed; he is liable for all the torts which his agent commits in the actual or apparent course of his employment; and if the agent commits a tort in the apparent course of his employment the principal is liable therefor even though he was ignorant thereof and the agent in committing it exceeded his actual authority or disobeyed the express instructions of his principal. Thus a principal is civilly liable to third persons where his agent, while acting within the scope of his real or apparent authority, is guilty of assault and battery, conversion, fraud, or trespass."

An extensive note pertaining to the identical question presented here is found in L. R. A. 1917F, p. 962. The question is treated under the title, "Implied or Ostensible Authority of Agent for the Sale of Land as to Representations." The note is both illuminating and exhaustive. Some of the cases considered are for rescission and some are actions for damages. It would be a useless consumption of time and space to quote from the cases referred to as the note itself succinctly states the questions involved and the decisions of the courts thereon.

We are not unmindful of the fact that upon this question there is a conflict of authority. Appellant refers us to the following cases which appear to support their contention in a greater or less degree: *Samson* v. *Beale,* 27 Wash. 557, 68 Pac. 184; *O'Daniel* v. *Streeby,* 77 Wash. 414, 137 Pac. 1025, L. R. A. 1915F, 634; *Ellison* v. *Stockton,* 185 Iowa, 979, 170 N. W. 437; *Hodson* v. *Wells & D. Co.,* 31 N. D. 395, 154 N. W. 193, L. R. A. 1917F, 958; *National Armor Co.* v. *Brumer,* 19 N. J. Eq. 331; *Lansing* v. *Coleman,* 58 Barb. (N. Y.) 619; *Dellwo* v. *Peterson,* 32 Idaho, 72, 180 Pac. 167. Without commenting upon these cases or attempting to distinguish them, it is sufficient to say that in so far as they conflict with the cases which we have quoted and the cases in the note above referred to we are not inclined to follow them. It would, in our opinion, be an imposition upon the general

public, and repugnant to sound business morality, to hold that a principal can clothe an agent with the apparent power of a selling agent and send him forth to induce persons to become purchasers of the principal's property without also holding that the principal is bound by any reasonable representation of fact the agent may make concerning the property with the view of effecting a sale.

The cases cited and relied on by appellant protect the innocent principal against the fraud of his own agent whom he has clothed with apparent authority and cast the burden of the loss resulting from the agent's fraud upon the adverse party who was also innocent. This, in our opinion, is palpably inequitable and unjust. It ignores the wholesome rule stated in numberless cases, including *Copeland* v. *Tweedle,* supra, in which it was said:

"Although perfectly innocent of fraud herself, yet, having placed her brother [the agent] in a position to defraud by putting her land in his hands for sale, the loss resulting from his deception must fall upon her as between herself and another equally innocent."

This rule has received recognition and approval in at least one case decided by this court in which an agent's fraud constituted the basis of the action against an innocent principal. In *Sullivan* v. *Evans-Morris-Whitney Co.,* 54 Utah, 293, the court, at page 304 (180 Pac. 435, 439), uses the following language:

"As an instance of moral obliquity, as far as we are informed the case has no parallel in the annals of human frailty. We believe that morally the defendant is entirely innocent; that it, too, was a victim of the dishonesty of its own trusted agent. We believe defendant's character as a business concern is above reproach; but one or the other of these parties must suffer the consequences of Taylor's dishonesty, and we have no dubiety in arriving at the conclusion that the burden should fall upon the party that held Taylor out and gave him the character and standing of an honest man."

It is unnecessary to multiply cases in support of a rule so wholesome and just and well supported by authority.

In addition to their reliance upon the fact that the representations made by Murphy, Dunn, and McClain were within

the apparent scope of their authority as selling agents, respondents also contend that by defending the action and interposing counterclaims for damages on the alleged grounds of false representations by plaintiffs as to their California lands defendant ratified and adopted the entire transaction. The contention is made that "a ratification is implied by defending as well as by bringing an original action," and the following authorities are referred to: 1 Jaggard on Torts, 270; *Lathrop* v. *Bank*, 8 Dana (Ky.) 114, 33 Am. Dec. 481; *Smith* v. *Plummer*, 5 Whart. (Pa.) 89, 34 Am. Dec. 530; *Gibson* v. *Norway Sav. Bank*, 69 Me. 579; *Edgar* v. *Joseph, etc.*, 172 Mass. 581, 52 N. E. 1083; 1 Mechem, Agency, 446. We seriously doubt the applicability of any of these cases to the situation presented here. In the instant case the defendant's contention is, not only that the alleged representations of Murphy, McClain, and Dunn were not within the apparent scope of their authority, but also that said representations were not made. Murphy, Dunn, and McClain testify that they made no such representations. So that it does not seem to the court that by setting up these defenses defendant thereby ratified the entire transaction. Neither does it appear that the filing of the counterclaim should have any such effect, especially in view of the fact that defendant was bound to assert its right to damages, if any it had, by way of counterclaim or be forever barred, Comp. Laws Utah 1917, § 6577. Besides this, alleging in the complaint that false representations had been made by defendant's agents was by no means conclusive that such representations had been made but only notice that plaintiffs had presented such an issue. If defendant had admitted that such representations had been made or had knowledge thereof, and had defended on the grounds that they were immaterial and irrelevant, or that the agents had no authority to make them, a different question would be presented, and a ratification of the transaction might be deducible from the facts and circumstances of the case. It must be conceded that the defendant had the right to traverse both the facts of agency and the making of the representations without being chargeable with ratifying the entire transaction.

In connection with the assignment of error alleging there is no evidence that the selling agents acted within the actual or apparent scope of their authority defendant also invokes consideration of the court's instruction No. 8 and defendant's exception thereto. The instruction reads as follows:

"You are instructed that, if you believe from the preponderance of the evidence that Murphy or Dunn or McClain or any or all of them, in dealing with plaintiffs in reference to the exchange of property involved in this case, acted as the defendant company's agent or agents, whether employed to so act or not, or known to have so acted or not, then the defendant company would be liable on account of the acts and representations of Murphy or Dunn or McClain or any or all of them in effecting the exchange, and, if the plaintiffs were induced to make the exchange by one or more material false representations made by Murphy or Dunn or McClain or any or all of them, on which the plaintiffs relied, then in contemplation of law it is the same as if the defendant company made such representation or representations, since it claims the benefit of the transaction."

In view of our holding that the defendant by defending and filing a counterclaim did not ratify the transaction, it follows as a necessary corollary that the instruction above quoted is erroneous, but, inasmuch as we have also held that Murphy, Dunn, and McClain acted within the apparent scope of their authority in making the representations in question, it is quite clear that defendant was not prejudiced by the instruction.

In the same connection appellant also invokes consideration of its second request for instruction which was refused. The request relates to representations made by an agent and the agent's authority for making them. Appellant quotes the following portion of the request upon the refusal of which it bases its exception.

" * * * It must reasonably appear from the facts or circumstances shown by the evidence that the person who made the representation was an agent of the defendant and was acting within the scope of his authority; or, in other words, that he was authorized by the defendant to make the particular representations of which complaint is made."

It is needless to say the court did not err in refusing this request. If the representations were within the apparent

scope of the agent's authority, they were just as binding upon the principal as if within the actual scope. The proposed instruction entirely disregards this elementary principle of the law of agency.

Appellant's next contention is that the court erred in admitting evidence in relation to the value of the California land which the plaintiffs exchanged for the water stock sold to them by defendant and erred in giving instruction No. 10 relating to the measure of damages.

Instruction No. 10, so, far as material, reads:

"You are instructed that, if you find the issues in favor of the plaintiffs, then they would be entitled to damages as follows:

"First. The amount of the difference, if any, between the fair market value, as determined by you from the preponderance of the evidence, of the Utah land and water rights thereto appurtenant acquired by plaintiffs, and the fair market value, as determined by you from the preponderance of the evidence, of the California land and appurtenances thereto, conveyed by plaintiffs in exchange therefor at the time of such exchange. * * *"

As a foundation for this instruction the court had previously admitted evidence over defendant's objection of the actual value of the California land which plaintiffs exchanged for the water stock in question. Plaintiffs had also testified that the lands they entered were worthless for farming purposes because of the alkali, and that the water stock was worthless because it was made appurtenant to the land. Plaintiffs also testified that the California land exchanged for the water stock was of the value of $20,000, and that, if the land they entered had been as represented, the land and water right would have been worth $70 per acre.

Defendant's contention is that the true measure of damages in cases of this kind is the difference between the actual value of the land purchased and the value it would have had if it had been as represented. In support of this rule defendant cites: 27 C. J. 92; 12 R. C. L. 452; Sutherland on Damages (2d Ed.) vol. 3, § 1171; *Hecht* v. *Metzler*, 14 Utah, 408, 48 Pac. 37, 60 Am. St. Rep. 906; *Averill* v. *Boyer*, 76 W. Va. 642, 87 S. E. 259; *Stoke* v. *Converse*, 153 Iowa, 274, 133 N. W. 709, 38 L. R. A. 465, Ann. Cas. 1913E, 270, and note;

*Moore* v. *Hutchins,* 102 N. E. 440; *Page* v. *Parker;* 43 N. H. 363, 80 Am. Dec. 172, and note 184; *Chapman* v. *Bible,* 171 Mich. 663, 137 N. W. 537, 43 L. R. A. (N. S.) 373, and note. This rule applied to the evidence in this case would have warranted the jury in finding a verdict for the plaintiffs in the sum of $21,000 at least, without considering plaintiffs' expenditures in moving upon the land and attempting •to raise a crop thereon. The jury only allowed plaintiffs the sum of $14,845. The most that can be said . is that the admission of the evidence and the giving of instruction No. 10 was error without injury, for which the judgment should not be reversed. Comp. Laws Utah 1917, § 6622.

Finally, it is insisted by appellant that the evidence is insufficient to support the verdict, or any verdict for plaintiffs, and therefore the court erred in denying appellant's ·request for a directed verdict and in overruling its motion for a new trial.

Under this assignment appellant relies on many features of the case already considered and disposed of against its contention. For instance, it is argued that the representations set forth in the circulars as well as the statements made by Murphy, Dunn, and McClain were immaterial, or, if material, were not shown to be false, and that there is no evidence to show that the persons mentioned had any authority to make said statements; that having examined the lands before making their purchase plaintiffs are presumed to have relied on their own judgment and investigations. As to these matters we have nothing to add to what has already been said. But defendant makes the further objection that the record fails to show that the water stock had no value separate and apart from the land, and that the amount of damages awarded by the jury cannot be reconciled with any evidence in the record. It is assuming a great deal for appellant to contend that there is no evidence that the water stock had no value separate and apart from the land when we consider the language of the certificates of stock which defendant gave to plaintiffs as representing their water rights for

the land. In each certificate of stock, after describing the particular land entered by the plaintiff to whom the certificate was delivered it is said: "This water right is dedicated to and appurtenant to and shall be used only upon the land above described." Appellant insists that, notwithstanding this is the kind of evidence it gave to plaintiffs of the character of water right it conveyed to them, yet plaintiffs are not permitted to rely upon the evidence as being true. In other words, the language above quoted must be construed in a "Pickwickian sense" rather than given its natural and ordinary meaning. We hardly know how to deal with a contention of this kind. If this were a case in equity in which plaintiffs were seeking a modification of the language of the certificate and upon a right to transfer the water to other lands, we would be in a position to understand the logic of appellant's contention. But in that case appellant might not make the same contention that it is making now. In any event, it does seem to us that plaintiffs had the right to rely upon the language of the certificates they received from the defendant as representing the extent of their water rights together with the limitations thereof. Upon this theory it was admissible, in evidence as against the defendant. The effect, of course, was to enhance the damages of plaintiffs should the jury find they were entitled to damages. But this effect was liable to be minimized, if not entirely destroyed, by evidence on the part of defendant as to what value, if any, the water stock had separate and apart from the land. In its evidence before the jury the appellant was permitted over plaintiffs' objection to state that in the fall of 1915 the water stock was being bought and sold at $70 per share. It was also permitted to show that the transfers of water from one piece of land to another had been permitted, and the testimony even went so far as to show that the water had an actual market value separate and apart from the land, but there the examination ended. The market value of the water stock apart from the land was not asked for by the defendant, and consequently the record is silent as to what such market value was. It thus appears that defendant had ample opportunity given by the court to off-

set against any damages the plaintiffs might have sustained, full value of the water stock separate and apart from the land. There is nothing to indicate that the jury did not place some value on the water stock, for, as before stated, under the evidence in the case it might have found for plaintiffs at least the sum of $21,000.

But aside from this view of the case respondents take the position that plaintiffs abandoned their right to the water, and by their conduct are estopped from hereafter asserting a right thereto. Much could be said in favor of this concession on the part of respondents, but we do not deem it within our province in the instant case to determine that question. Neither do we deem it necessary to enter upon a discussion of the scope and meaning of the Carey Act as bearing upon the right to transfer water nor to review the authorities cited by appellant relating thereto.

The last contention of appellant is that the amount of damages awarded by the verdict of the jury cannot be reconciled with any evidence in the record. Upon this proposition it is perhaps sufficient to say that verdicts of juries, especially in actions for damages, can seldom be determined with mathematical precision even by the jurors themselves. If their verdicts can be set aside simply because the party in whose favor the verdict is rendered, or the court is unable to mathematically determine how the jury arrived at its conclusion, a very large percentage of verdicts would be set aside as unsupported by the evidence. If the verdict is within the evidence and not obviously inconsistent therewith, that is sufficient and oftentimes all that can reasonably be **16, 17** expected. In this case the plaintiffs appraised their California land at $20,000 or $21,000. There is evidence in the record as to plaintiffs' expenditures in connection with the transaction amounting to between $2,000 and $3,000. So that it appears conclusively upon more theories than one that the verdict of the jury is supported by the evidence.

We find no reversible error in the record. The judgment is affirmed at appellants' costs.

WEBER, C. J., and GIDEON, FRICK, and CHERRY, JJ., concur.

### On Rehearing.

PER CURIAM. Appellant on application for a rehearing assigns numerous objections to the opinion. We will only consider such as are apparently meritorious.

In addition to objections urged in its original brief it is now insisted that the court's instruction No. 8 is defective in not stating that the false representations of defendant's agents upon which plaintiffs relied were made by such agents with knowledge that the representations were false. It is admitted by defendant, in its brief, that proper instructions as to this matter were given in instructions No. 4 and No. 5. The merits of the objection can be better understood by reading in this connection instruction No. 15:

"These instructions are to be construed and considered together as a whole. Each instruction should be read and understood with reference to and as a part of the entire charge and not as though such instruction was intended to present the whole law of the case on any particular subject."

It is not to be presumed that the jury, in the face of such an instruction, would assume that instruction No. 8 was "intended to present the whole law of the case on that particular subject." It is our duty to presume that the jury considered all of the instructions of the court, unless the contrary is clearly manifest. No substantial reason is given for repeating the instruction.

Appellant next assails the opinion, because we held as matter of law that Murphy, Dunn, and McClain acted within the apparent scope of their authority as defendant's agents when they made the false representations upon which the plaintiffs relied. They especially find fault, as far as McClain is concerned, who they say, "by all the testimony was only employed to locate, that is to say, point out, land upon the project still open for entry."

It being assumed by appellant that the testimony as to McClain's authority was weaker than that of Dunn and

Murphy, a brief review of one or two features of McClain's testimony, elicited on cross-examination while testifying as a witness for defendant, may be enlightening. He testified concerning his various occupations prior to his employment at Delta, including that of buying and selling real estate. He had been employed in the beginning by the Western Securities Company. He worked for a commission. He received his commission when a sale was made. He commenced in 1914. He testified it was his business to induce prospects to purchase and locate, and in going out with prospective purchasers and showing them the lands he tried to induce them to locate and to purchase water stock. Such is the testimony of McClain himself when testifying as a witness for defendant. It should be remembered that the business of appellant was locating people upon the land and selling water stock representing water rights for the land. Its source of profit was in the sale of water stock. It could not sell its water stock unless the land was satisfactory. McClain, as before stated, testified that his business in showing prospects over the land was to induce them to purchase and locate, and that he "did try to induce them to locate and purchase water stock." This testimony was uncontradicted. How can it be contended that McClain was not a selling agent for the defendant, and that defendant was not bound by his representations? Murphy and Dunn were unquestionably agents of the defendant. Besides this, all of these agents had been engaged in the business of buying and selling real estate before they entered appellant's employment. They were no doubt employed because they had experience in that line of business. Is it believable that a business concern like the defendant company would employ that type of men to go out with prospective purchasers merely for the purpose of pointing out the land open to entry? Is it believable that such men would have been employed to do what might have been done by the chauffeur who drove them out, or even by an employee much less experienced? The testimony further shows that at least two of these agents were usually present when prospective pur-

chasers were being conducted over the land, which would seem to be more employees than were necessary to merely point out the land open to entry.

In view of the record we were irresistably led to the conclusion, as matter of law, that Murphy, Dunn, and McClain were selling agents of appellant, and that when they made the representations concerning the land testified to by plaintiffs, they were acting within the apparent scope of their authority.

But it is further contended by appellant that there is no evidence that Murphy, Dunn, or McClain knew that their representations were false. In answer to that contention we suggest that when these selling agents, or some of them, informed plaintiffs, in answer to questions, that there was no alkali, in the land, that what plaintiffs saw and inquired about was gypsum, that the land had been tested for alkali and was similar in kind and quality to other lands in the vicinity producing good crops, they either knew they were making false representations, and did it with intent to deceive, or they knew nothing about the matter and were recklessly affirming as a fact something of which they were entirely ignorant. In either case it was a false representation in contemplation of law in an action of this kind. Addison on Torts (6th Ed.) American notes by Baylies, § 798, cited in the opinion.

We are still of opinion that notwithstanding instruction No. 8 was erroneous in assuming that appellant ratified the representations of its agents because it claimed the benefits, nevertheless the giving of the instruction was harmless error, and no right of defendant was prejudiced thereby, if the water stock in question is transferred to the defendant.

Appellant also contends there was no evidence that plaintiffs relied on the representations made by its agents. In addition to the representation that there was no alkali in the land it was also represented that the land located by plaintiffs was similar in kind and quality to other lands in the north tract of the Delta project upon which good crops were growing. The jury found that such representation was untrue, and also found that the land located by plaintiffs

was unfit for agriculture at the time plaintiffs applied to purchase it.

Whether or not the plaintiffs relied on the false representations referred to is deducible from the circumstances and conduct of the parties as well as from the positive statements of witnesses. These representations were made to plaintiffs before they made their applications to purchase either the land or the water stock. At the time they consummated their purchase they were evidently satisfied with their bargain. They exchanged their lands in California for the Delta land and water rights, moved to Delta with their farming equipment at considerable expense, and at further expense endeavored to produce a crop. The crop was a failure, because, as the jury evidently believed, the land was not as it had been represented. The plaintiffs entirely abandoned the land, together with the water right therefor, and returned to California. This court would be going a long way if it should assume to hold that there was no evidence upon which the jury might find that plaintiffs, when they made the purchase, relied on the false representations to which we have referred. We are of opinion that was a question for the jury to determine from all the facts and circumstances of the case.

The court is, however, not entirely satisfied with the opinion as written, because it leaves the title to the water stock, nominally at least, in the plaintiffs. We are convinced upon the whole record, including both findings and evidence, that the jury in arriving at their verdict must have concluded that the water stock was of no value to the plaintiffs, and that by their verdict it would revert to the defendant. The complaint alleged that it was worthless because appurtenant to the land which was also worthless. The evidence was to the same effect. The brief of plaintiffs on appeal also disclaimed any title to the water stock, and assumed that plaintiffs had abandoned it and were estopped from hereafter setting up any claim thereto. In these circumstances the court feels justified in modifying the opinion and order of the court heretofore made, so that defendant's right and title

to the water stock may be rendered certain. The stock certificates were issued to the plaintiffs. They are still in their names unindorsed and on file as exhibits in the case. There is nothing to prevent a formal transfer or surrender of the stock to the defendant by plaintiffs or their attorneys. By such transfer or surrender the defendant will have received all it gave to the plaintiffs in exchange for their California land, in addition to the price for which it sold such land, which price, as we understand the record, defendant has already received. We are satisfied that this arrangement will eliminate any possible prejudice to the defendant which may have resulted from instructions to the jury relating to the rule of damages.

It is therefore ordered that plaintiffs shall within thirty days from receipt of notice of this order make proper transfer of said water stock to the defendants, and within said time file with the clerk of this court proper evidence of said transfer, in which event the application for rehearing will be denied at defendant's costs; otherwise the application for rehearing will be granted at the cost of plaintiffs.