**S & F SUPPLY COMPANY, a Utah corporation, et al., Plaintiffs and Respondents,**

**Zions First National Bank, a National association, Intervening Plaintiff and Respondent,**

v.

**S. Craig HUNTER, Defendant and Appellant.**

No. 12686.

Supreme Court of Utah.

Oct. 3, 1974.

Walter P. Faber, Jr., of Watkins & Faber, John Taft Benson of Watkins & Faber, Henry E. Heath of Strong & Hanni, Salt Lake City, for defendant and appellant.

Alvin I. Smith, Richard H. Nebeker, Salt Lake City, for Zions Bank.

C. Nelson Day, U. S. Atty., and H. Ralph Klemm, Asst. U. S. Atty., Salt Lake City, for intervening plaintiff and respondent.

CROCKETT, Justice:

The foundation of this case is an action by the plaintiffs against defendant S. Craig Hunter alleging fraud and breach of a contract, by which he agreed to purchase 10,000 shares of stock in Universal Leasing Corporation. Defendant's defenses and a counterclaim included allegations that he was fraudulently induced into entering into the agreement, for which he sought rescission, and avoidance of the obligation. These he asserted both against the plaintiffs, and the intervened plaintiff, Zions First National Bank, who was holding the stock as security for a loan to the plaintiffs. The trial was to a jury, to whom the trial judge submitted a total of 25 interrogatories as to the disputed issues of fact. Upon the basis of the answers, all of which were adverse to the defendant's contentions, the court entered judgment for the plaintiffs. Defendant appeals.

In accordance with the standard rule of review, where the evidence is in dispute, we assume that the jury believed the evi-

dence supporting their answers to the interrogatories.[1]

Plaintiffs Souvall brothers were officers and principal shareholders of S & F Supply Company and Burger-in-the-Round. In the summer of 1969 these corporations jointly applied for a Small Business Administration (herein called S.B.A.) loan of $200,000. The first application was refused. But a second one, offering additional security of certain corporate assets, the equity in the Souvalls' homes, and 10,000 shares of stock in Universal Leasing Corporation, owned in equal amounts by the brothers, was approved. In August, 1969, S & F Supply Company and Burger-in-the-Round received $200,000, S.B.A. providing 75% and Zions Bank 25% of that amount. There is evidence that the Bank gave the Souvalls some help in preparing the loan application.

Only one installment had been paid on this loan when, in December, 1969, both of the borrowing corporations filed petitions in bankruptcy. The Souvalls requested and reached an agreement with S.B.A. and the Bank, giving them a chance to sell the other collateral, and apply the proceeds to repay the loan, and thus attempt to save their homes from foreclosure. In that same month Universal Leasing Corporation had engaged in a merger resulting in a new company, Universal-Rockwell. Under the terms of the merger, the 10,000 shares of Universal Leasing Corporation pledged to the Zions Bank could be exchanged for 4,530,000 shares of the new Universal-Rockwell Company.

On February 12, 1970, defendant Hunter, a licensed securities broker, attended a meeting at which Mark Eames, president of Universal-Rockwell, and Jerry Timothy, an officer of North Star Marine, discussed an upcoming merger of these two companies. Eames told the defendant about the 10,000 shares of Universal Leasing, owned by the Souvalls, which was held by the Zions Bank. He suggested that they might be for sale, and gave defendant two financial statements of Universal Leasing, dated March and November of 1969. The Universal Rockwell-North Star Marine merger was consummated on February 16, 1970.

Within a few days after the February 12th meeting, defendant contacted Donald Bennett, loan officer of the Zions Bank, to inquire about the 10,000 shares of Universal Leasing stock. Bennett told Hunter that the Bank held the stock as security; and that for any information about it he should go to the Souvalls. Upon his inquiry, the Souvalls sent Hunter back to the Bank; and authorized it to give him whatever information it had concerning Universal Leasing.

A critical aspect of this case is the sharp divergence in the evidence concerning the information furnished by the Bank about this stock. Hunter said that the Bank gave him only one financial statement on Universal Leasing and told him that was all the information it had. On the other hand, Mr. Bennett testified that he showed the defendant two financial statements, both dated 1969; that he pointed out that they were inconsistent; and advised the defendant to ascertain the value of the stock for himself. Of similar import is the testimony of John Langeland, another Bank official. He testified that he told the defendant that the Bank had no reason to have a current and reliable Universal Leasing financial statement; and that he advised the defendant to obtain whatever additional information he desired for himself by audit or otherwise. From the jury's answers to the interrogatories, as commented on below, it is obvious that they believed the Bank's version of this evidence.

It was the following month, on March 9, 1970, that the defendant signed the contract of concern here, in which he agreed to purchase the 10,000 shares of Universal Leasing Stock, along with the remaining collateral, for $133,500. It included provisions that trading restrictions on the stock should be removed; and that consent for the sale would be obtained from the bankruptcy

---

1. See Memmott v. U. S. Fuel Co., 22 Utah 2d 356, 453 P.2d 155.

court by the sellers, which provisions the latter complied with.

Later that month, on March 25, 1970, the defendant represented to Mr. Bennett that he was in the process of liquidating some stocks he held in New York, the proceeds of which would be applied on the contract. On that promise, Bennett turned over the certificates of Universal Leasing stock to Hunter. It seems significant that it was over a month later, in the fore part of April, during which time defendant Hunter could have made further inquiries about the value of the stock, that he signed the note upon which this action rests. His claim is that Bennett requested him to sign only as a bookkeeping convenience for the Bank, and told him it was not to be considered binding upon him. Whereas, Bennett disputed this and testified that there was no other intent expressed than to evidence the debt as shown on its face, since the defendant had not completed payment for the stock as agreed.

Immediately after receiving the 10,000 shares of Universal Leasing, Mr. Hunter exchanged them for 4,530,000 shares of Universal-Rockwell, Inc., which he commenced selling and trading at ten cents per share. He received about $9,000 in cash and some property through these sales. Shortly thereafter, on May 27, 1970, the merger between Universal-Rockwell and North Star Marine was rescinded, which had a depressing financial impact upon Universal Rockwell. Hunter claims that it was after the foregoing events, in the summer of 1970, that he discovered that the Universal Leasing Stock was worthless; and avers that upon the tender back of the stock or its equivalent, he was entitled to rescission of the contract to purchase it.

Also pertinent is the fact that there is evidence that Hunter was engaged in negotiations to sell the stock at three cents per

share as late as September, 1970. Though it seems somewhat unrealistic, he testified that he told the prospective buyer that he thought the stock was worthless. Meanwhile Hunter had turned over to the plaintiffs the $9,000 he received for the stock he sold; and he has also turned over the amount realized from the other collateral received under the contract, $44,252.69, leaving the unpaid balance of $80,247.31 sued for herein.

After the conclusion of the evidence the trial court dismissed Hunter's counterclaim based on fraud; and later, upon the basis of the jury's answers to the interrogatories, the court ruled that neither the plaintiffs nor the defendant had been guilty of fraud; and entered judgment for the plaintiffs for breach of the contract.

The issues of concern here arise from the defendant's argument that, irrespective of the requirements of proving the elements of common law fraud,[2] because of false representations made to him, he was entitled to rescission of the contract by reason of Section 61–1–22(1)(b), U.C.A.1953, of the Utah Uniform Securities Act which provides:

> Any person who offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact . . . (the buyer not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission, is liable to the person buying the security from him, who may sue either at law or in equity to recover the consideration paid for the security, . . .[3]

With respect to defendant's reliance on that statute, we acknowledge our agreement with certain propositions advocated by him: That its objective was to

2. See Stuck v. Delta Land etc., 63 Utah 495, 227 P. 791; Pace v. Parrish, 122 Utah 141, 247 P.2d 273.

3. This section of our act is sufficiently identical with Sec. 410(a)(2) of the Uniform

Securities Act (U.L.A.), and Sec. 12(2) of the Federal Securities Act of 1933 that we regard adjudications on those statutes as helpful to us.

moderate the requirements of common law fraud, and the difficulties involved in its proof, by imposing a higher standard of ethics and responsibility upon the sellers of securities in placing upon them the affirmative duty of making full disclosure of all material facts;[4] and concomitantly, it is intended to reduce the buyer's burden of investigation and inquiry, and make it easier for him to obtain redress on the basis of deception.[5] Under its provisions a buyer need only show by a preponderance of the evidence that in making the sale the seller made an untrue statement or omission concerning a material fact; and that the buyer did not know of the untruth or omission.[6] And, an aspect of this statute important to note, is that when the buyer has done so, the statute does change the burden of proof by expressly requiring the seller to show that he " . . . did not know, and in the exercise of reasonable care could not have known, of the untruth or omission . . .".

■ Although it is said that the intent of this statute is to eliminate the necessity of the buyer proving the seller's intent to defraud,[7] the imposition of the remedy of rescission, which takes away the seller's rights under the contract, must necessarily be predicated on some blameworthy conduct on his part. As was correctly observed, by the Second Circuit Court, " . . . 'some form of the traditional scienter requirement' . . . is preserved . . . whether it be termed lack of diligence, constructive fraud, or unreasonable or negligent conduct, . . . [that] . . . standard . . . promotes the deterrent objective of the rule."[8]

■ Correlated to the above, it has also been said that this statute does not require the buyer to prove the element of his own reliance on the false representation.[9] It is true that the statute does not expressly so state. But all of the law cannot be written in one sentence or one statute. This, and any other statute, must be considered in its relationship to the total fabric of the law and be so interpreted and applied as to be consistent with common sense, and with elemental principles of justice. It follows that the statute cannot fairly be understood as meaning that a buyer can naively or blindly purchase stocks without concern for the truth or reasonableness of representations made, then if it later develops that it would serve his interest, assert a claim of falsity of a representation about which he previously had no concern, and upon which he placed no reliance, as a basis for avoiding his contract. This is fairly deducible from the parenthetical clause in the statute quoted above (the buyer not knowing of the untruth or omission).

■ In that regard, some notice should also be taken of the fact that the statute gives a remedy only for falsity of a "material" fact or omission. That also seems to import some objective standard of reliance, because the determination of whether a fact is "material" can only be made in the frame of reference of the definition of what a material fact is: that is, it must be something which a buyer or seller of ordinary intelligence and prudence would think to be of some importance in determining whether to buy or sell.[10]

As a consequence of what has been said, we think that when all parts of this statute

---

4. See Harry Shulman, Civil Liability and the Securities Act, 43 Yale L.J. 227, 243, 244.

5. See Speed v. Transamerica Corp., 99 F. Supp. 808, 831 (D.Del.1951).

6. This contrasts with clear and convincing evidence required for common law fraud, see cases in footnote 2 above.

7. Ellis v. Carter, 291 F.2d 270, 272 (9th Cir. 1961); Royal Air Properties Inc. v. Smith, 312 F.2d 210, 212 (9th Cir. 1962).

8. S. E. C. v. Texas Gulf Sulfur, 2 Cir., 401 F.2d 833, 854–855. For a similar discussion of the adaption of the meaning of the terms *scienter* and intent re common law fraud, see S. E. C. v. Capital Gains Bureau, 375 U.S. 180, 192–193, 84 S.Ct. 275, 11 L.Ed.2d 237.

9. Ellis v. Carter, footnote 5 above.

10. See S. E. C. v. Texas Gulf Sulfur, footnote 7 above.

are considered together, it is both in harmony with its purpose of placing a higher responsibility upon the seller of securities and of easing the burdens upon the buyer, and in the interest of justice to both, that the buyer should be held to the traditional and practically universal standard of duty imposed throughout our law: that of reasonable care and prudence under the circumstances. This is particularly true when it is realized that this would include the fact that usually the seller of securities would be more experienced and more knowledgeable than the buyer. However, it is to be observed that that is not necessarily always true. In this case, Mr. Hunter was a licensed broker, who himself manifested an interest in entering into this transaction.

With the foregoing in mind, we turn to the arguments of the defendant Hunter that the trial court failed to give him the benefits conferred upon buyers of securities by the statute quoted above, but instead adhered too closely to the requirements of common law fraud. It is recognized that there are some difficulties in this case because of the differing status of the parties: the Souvalls as the owners and sellers charging fraud against Hunter, and defendant Hunter as buyer, seeking rescission based on the statute, and adding the charge of fraud against the plaintiffs and also against Zions Bank, the pledgeholder.

■ The first point we treat is as to the status of the intervening plaintiff, Zions Bank. Hunter argues that the court should have instructed the jury that the Zions Bank was, as a matter of law, the agent of Souvalls for whatever occurred in the transaction; and that it should be regarded as a seller of the securities and held accountable under the statute. In this regard the defendant is mistaken; and has taken an inconsistent position. As opposed to his present argument that the jury should have been instructed that the Zions Bank was Souvalls' agent as a matter of law, his own brief states that "there was sufficient evidence to *raise a jury question* as to appellant's (defendant's) theory of agency . . .". Under the facts as herein above recited, we do not see that the jury was misled as to the position of the Bank, nor that the trial court committed any reversible error in failing to instruct as the defendant advocates.

Upon consideration of this case in the light of the foregoing discussion, and of the fact that the court submitted to the jury all of the disputed material issues upon 25 special interrogatories, we think it unnecessary to detail the various claimed errors in the instructions relating to the mutual claims of fraud and the parties to whom they should or should not apply. It can fairly be said in summary that the essential issues of fact were presented to the jury in a form and manner not substantially inconsistent with the principles hereinabove set forth, and that their findings of fact shown by their answers completely defeat defendant's claimed right of rescission.

■ In response to the questions propounded, the jury answered: (1) that the Souvalls made no misrepresentation of material fact; (2) that the representations that they did make were not false; (3) that the Souvalls did not know, and in the exercise of reasonable care could not have known of untruth of representation or omission as charged by defendant; and (4) similarly and significantly, that they did not know that Universal Rockwell was in serious financial difficulty in February and March, 1970, nor anticipate that its stock would become valueless. It can also fairly be said that the answers reflected a similar view of the facts, as adverse to defendant's contentions, and favorable to Zions Bank.

We see the overall picture of this case as falling within the observation we have made in numerous cases: that what the parties are entitled to is a full and fair opportunity to present their respective claims, their evidence in support thereof, and their arguments thereon, to the court and jury. When this has been accomplished, the verdicts and the judgment should be given a

presumption of correctness and propriety; and they should not be overturned for mere irregularities or errors, but only if it is shown that there is error which is substantial and prejudicial in that it appears that there is a reasonable likelihood that the result would have been different in the absence of such error, which we have concluded does not exist here.[11]

Affirmed. Costs to plaintiffs (respondents).

CALLISTER, C. J., and HENRIOD, ELLETT and TUCKETT, JJ., concur.

[11]. Hales v. Peterson, 11 Utah 2d 411, 306 P.2d 822.